[Civ. No. 34194. First Dist., Div. One. June 4, 1975.]

In re METROPOLITAN BAPTIST CHURCH OF RICHMOND, INC.,
in Voluntary Dissolution.
METROPOLITAN BAPTIST CHURCH OF RICHMOND, INC.,
Plaintiff and Appellant, v.
EVELLE J. YOUNGER, as Attorney General, etc., et al.,
Defendants and Respondents;
FOOTHILL BOULEVARD BAPTIST CHURCH et al.,
Interveners and Respondents;
FIRST BAPTIST CHURCH OF DUBLIN,
Claimant and Respondent.

COUNSEL

Colin Peters for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Carole Kornblum, Deputy Attorney General, for Defendant and Respondent Attorney General.

No appearance for other Respondents.

**OPINION**

**ELKINGTON, J.**—The Metropolitan Baptist Church of Richmond, Inc. (hereafter the "Church") was incorporated in 1956 as a California nonprofit corporation for religious and charitable purposes. It was a fundamental Baptist church, and like Baptist churches generally, it was autonomous, democratic and congregational. All decisions, ecclesiastical and temporal, were by majority vote of the individual adult members of the congregation; there was no hierarchy or other ruling authority. A suitable church building was thereafter acquired, and Baptist church services were commenced, in the City of Richmond.

Eventually an adult church membership approaching 50 was reached, but in time dissensions arose resulting in the expulsion of some of the members. By 1970, the congregation was reduced to three persons, apart from the pastor, his wife and their adult son. Finding it impossible to

continue the Church's operations, those six members voted to dissolve the church corporation, and to liquidate and distribute its assets. At the time, the pastor had already accepted the pastorate of Bethel Baptist Church of Harlan, Iowa.

The net assets of the Church after payment of all debts and dissolution expenses would approximate $25,000. At the dissolution meeting the six remaining members voted to distribute that sum as follows:

First Baptist Church of Dublin, California—one-third;

Bethel Baptist Church of Harlan, Iowa—one-third;

Beacon Inn Servicemen's Center, Long Beach, California—one-sixth;

Foothill Boulevard Baptist Church, Oakland, California—one-twelfth;

San Francisco Baptist Theological Seminary, San Francisco, California—one-twelfth.

As required by Corporations Code section 9801, the Church petitioned the superior court for authority to distribute its liquidated assets in accordance with the vote of its membership. As directed by the statute the Attorney General was joined as a party to the proceeding. Since the Church's assets were held in trust for religious purposes, the Attorney General's function was to insure that they be disposed of by decree of the court as the law and equity might require. (See Corp. Code, § 9801, 2d par.)

Thereafter in the superior court an appropriate hearing was held. Appearing were the Attorney General and representatives of the Church and of the five proposed distributees of its assets. Other interested persons were present, including one of the Church's incorporators; the latter opposed the Church's proposed distribution. Among other things, the evidence established the following.

The Church's articles of incorporation recited that its founders and incorporators were "desirous of forming and conducting in Richmond, Contra Costa County, a Baptist Church" to be named the "Metropolitan Baptist Church of Richmond." The corporate purpose, as relevant, was

declared: "To preach and teach the Scriptures in essential accord with the beliefs of Baptist Churches."

Extrinsic evidence was admitted, without objection, tending to establish that the intent of the Church's corporate founders was to form and conduct in Richmond, Contra Costa County, a Baptist church, to preach and teach the Bible in essential accord with the beliefs of fundamental Baptist churches. Further, the evidence established that there was no other fundamental Baptist church in Richmond or Contra Costa County, that each of the three Baptist churches nominated by the Church as a distributee of its assets was a fundamental Baptist church, and that the proposed distributees, Beacon Inn Servicemen's Center and San Francisco Baptist Theological Seminary, were not churches.

Some of the parties appearing before the superior court argued that the Church's proposed distribution should be approved; others contended that it should not, and made other recommendations. The cause was thereafter submitted for decision, and written findings of fact were waived by the parties.

The following judicial conclusions are implicit in the ensuing judgment of the superior court: as a matter of law and equity the Church's assets should be distributed, not as directed or suggested by the Church's congregation at the dissolution meeting, but instead in accordance with the Church's purpose as established by its articles of incorporation and the hearing's extrinsic evidence. That purpose was the founding and conducting of a Baptist church in Richmond, Contra Costa County, to preach and teach the Scriptures in that city in essential accord with the beliefs of fundamental Baptist churches.

In its memorandum of decision the court found no other such fundamental Baptist church to exist in Contra Costa County, and that a proposal of the Attorney General that "the funds be retained in trust so that another church of the same fundamental belief may be formed [in Contra Costa County was] not viable." The judgment recited that the San Francisco Baptist Theological Seminary was not a church, that the Beacon Inn Servicemen's Center of Long Beach "is not necessarily a church, and is not restricted to Baptist teachings," and that the Bethel Baptist Church of Harlan, Iowa, among other things, was "too far removed from the geographical area with which the petition is concerned." Thereupon, applying the *cy pres* doctrine, the judgment ordered that all of the Church's remaining assets be distributed, in equal shares,

to two fundamental Baptist churches of an adjoining county, the First Baptist Church of Dublin and the Foothill Boulevard Baptist Church of Oakland. It will be noted that the Church's desire was to distribute lesser shares of its property to those same churches.

The Church has appealed from the judgment.

Our first inquiry is whether the superior court's determination, that the Church's purpose was to teach and preach the Scriptures, as a church in Richmond, Contra Costa County, in essential accord with the beliefs of fundamental Baptist churches, was supported by substantial evidence.

The answer seems obvious. The Church's articles of incorporation, as noted, declared that its founders were "desirous of forming and conducting in Richmond, Contra Costa County, a Baptist Church," with the purpose to "preach and teach the Scriptures in essential accord with the beliefs of Baptist Churches." Extrinsic evidence also, indeed concessions of the parties, made it clear that the Church was to preach and teach the beliefs of *fundamental* Baptist churches, in a church located in the City of Richmond, Contra Costa County.[1] Substantial evidence supported the conclusion immediately at issue.

The next contention of the Church appears to assume, arguendo, that its purpose was as determined by the superior court. But it is insisted that the "decision of the congregation of an autonomous and independent Baptist church, which designates the recipients of its assets upon dissolution is an ecclesiastical decision binding and conclusive upon the court under the doctrine of separation of church and state." This "ecclesiastical decision," it is argued, must be respected even if contrary to the intent of the Church's founders as established at the superior court hearing.

The Church was a nonprofit corporation organized for religious purposes under the authority of Corporations Code section 9200. It was also, in law, organized for charitable purposes. (See Corp. Code, § 9200; *Estate of Lubin,* 186 Cal. 326, 327-328 [199 P. 15]; *Estate of Moore,* 219 Cal.App.2d 737, 742 [33 Cal.Rptr. 427].) The "specific and primary

---

[1] A contention of the Church is that there was *no conflict in the extrinsic evidence* on the pertinent issues. Accordingly it is argued that this reviewing court, under the rule of *Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], must itself determine the Church's purpose by its independent construction of the articles of incorporation. Were we to do so we would nevertheless be obliged to conclude that the superior court's determination was mandated by that documentary evidence alone.

purposes" for which the corporation was formed were required to be set forth in the articles of incorporation. (Corp. Code, § 9300, subd. (b).) Its assets necessarily consisted of gifts, or the proceeds and increment of gifts. ■ It is the law's policy that a charitable corporation use such assets for the purposes expressed in its articles of incorporation. (*In re L.A. County Pioneer Society,* 40 Cal.2d 852, 865-866 [257 P.2d 1]; *Brown v. Memorial Nat. Home Foundation,* 162 Cal.App.2d 513, 520 [329 P.2d 118, 75 A.L.R.2d 427].)

It follows that the property of a charitable or religious nonprofit corporation is held in trust " 'to carry out the objects for which the organization was created.' " (*Lynch v. Spilman,* 67 Cal.2d 251, 260 [62 Cal.Rptr. 12, 431 P.2d 636]; *In re L.A. County Pioneer Society, supra,* 40 Cal.2d 852, 860; *Estate of Clippinger,* 75 Cal.App.2d 426, 433 [171 P.2d 567].)

The rule is well stated in *Pacific Home v. County of Los Angeles,* 41 Cal.2d 844, 852 [264 P.2d 539], in this manner: "[A]ll the assets of a corporation organized solely for charitable purposes must be deemed to be impressed with a charitable trust by virtue of the express declaration of the corporation's purposes, and notwithstanding the absence of any express declaration by those who contribute such assets as to the purpose for which the contributions are made. In other words, the acceptance of such assets under these circumstances establishes a charitable trust for the declared corporate purposes as effectively as though the assets had been accepted from a donor who had expressly provided in the instrument evidencing the gift that it was to be held in trust solely for such charitable purposes."

■ California has expressed a strong public policy that trust property of a nonprofit religious or charitable corporation be not diverted from its declared purpose. Ordinarily the Attorney General is charged with the responsibility of preventing such a departure. (Corp. Code, § 9505.) Special statutory precaution is taken that the trust's purpose will continue, as nearly as possible, even after the corporation's dissolution. Corporations Code section 9801 provides, upon dissolution, for the division of the trust assets by the superior court, in proceedings in which the Attorney General must be a party.[2] In those proceedings, under the equitable doctrine of *cy pres* the corporate assets will ordinarily be transferred to another corporation, organization, society or trust so that

---

[2]Here, as noted earlier, the Church, petitioning the superior court for authorization to consummate its intended distribution of assets, joined the Attorney General as a party to the proceedings, thus recognizing the application of section 9801 to its affairs.

the original trust purposes can be carried out, as nearly as possible. (*In re Veterans' Industries, Inc.,* 8 Cal.App.3d 902, 917-918 [88 Cal.Rptr. 303].)

 The Church recognizes the general validity of the foregoing principles. But since it is a special kind of charitable institution, a church, it argues that such principles must yield to the First Amendment's strictures guaranteeing the free exercise of religion. More particularly, the Church urges, as noted, that the proposed distribution of its assets was an "ecclesiastical decision of an ecclesiastical tribunal" binding upon the state and its judiciary.

 Ecclesiastical matters ordinarily concern creeds and the proper mode of exercising one's belief, considerations of faith, including questions of what constitutes an essential of a church's faith, and matters of church discipline, tenets and general polity. (*Rosicrucian Fellow.* v. *Rosicrucian etc. Ch.,* 39 Cal.2d 121, 131-132 [245 P.2d 481] [cert. den., 345 U.S. 938 (97 L.Ed. 1365, 73 S.Ct. 828)]; *Horsman* v. *Allen,* 129 Cal. 131, 138 [61 P. 796].) In such matters the state, and its courts, have no legitimate concern or jurisdiction. (*Presbyterian Church* v. *Hull Church,* 393 U.S. 440, 446-449 [21 L.Ed.2d 658, 663-665, 89 S.Ct. 601]; *Rosicrucian Fellow.* v. *Rosicrucian etc. Ch., supra,* p. 131; *Owen* v. *Board of Directors,* 173 Cal.App.2d 112, 116 [342 P.2d 424]; *Church of Christ of Long Beach* v. *Harper,* 83 Cal.App. 41, 46-47 [256 P.2d 476].)

 It has long been recognized that the resolution of a church's property disputes, whether between church members, or between the church organization and the state, may sometimes touch upon ecclesiastical concepts. Nevertheless the courts will strike a balance between that which is primarily ecclesiastical, and that which is primarily secular. (*Anderson* v. *Salt Lake City Corporation,* 475 F.2d 29, 32 [cert. den., 414 U.S. 879 (38 L.Ed.2d 124, 94 S.Ct. 50)].) "There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property." (*Kedroff* v. *St. Nicholas Cathedral,* 344 U.S. 94, 120 [97 L.Ed. 120, 139, 73 S.Ct. 143].) And the belief "that any conduct can be made a religious rite and by the zeal of the practitioners swept into the First Amendment" has been consistently repudiated. (*Murdock* v. *Pennsylvania,* 319 U.S. 105, 109 [87 L.Ed. 1292, 1296-1297, 63 S.Ct. 870, 146 A.L.R. 81]; *Gospel Army* v. *City of Los Angeles,* 27 Cal.2d 232, 243 [163 P.2d 704].)

To resolve the often delicate question of the First Amendment's application to disputes concerning church property, a principle of state "neutrality" has developed. This concept has been described as the

application of "neutral principles of law, developed for use in all property disputes, which can be applied" without establishing "religion, or prohibiting the free exercise thereof"; in applying these neutral principles civil courts must take care "to decide church property disputes without resolving underlying controversies over religious doctrine." (*Presbyterian Church* v. *Hull Church, supra,* 393 U.S. 440, 449 [21 L.Ed.2d 658, 665].) A leading case on the subject is *Polen* v. *Cox,* 259 Md. 25 [267 A.2d 201], where the high court of Maryland stated (p. 30): "The relevant inquiry must be whether the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution *by the court* of ecclesiastical issues. . . . [A]s long as the court does not have to resolve the doctrinal propriety [of a church's action] in order to determine who has legal control of the property, there is no unconstitutional intervention by the state in church affairs."

Where civil or *property rights* are involved the courts of this state have always, evenhandedly, accepted jurisdiction over property disputes, even where ecclesiastical questions may have been indirectly involved. This rule was succinctly stated in *Providence Baptist Church* v. *Superior Ct.,* 40 Cal.2d 55, 60 [251 P.2d 10], in this manner: "As long as civil or property rights are involved, the courts will entertain jurisdiction of controversies in religious bodies although some ecclesiastical matters are incidentally involved." Earlier it was said in *Rosicrucian Fellow.* v. *Rosicrucian etc. Ch., supra,* 39 Cal.2d 121, 131: "The general rule that courts will not interfere in religious societies with reference to their ecclesiastical practices stems from the separation of the church and state, but has always been qualified by the rule that civil and property rights would be adjudicated."

In the case at bench we are dealing with the disposition of a church's property. From any reasonable view ecclesiastical concern, if any there be, is incidental and remote. The superior court's rulings were based upon general principles applicable alike to all churches and other charitable organizations. And they gave effect to the state's public policy that upon dissolution of a charitable organization its property shall be distributed in accordance with the purpose of the organization's founders and its property's donors.

We have closely considered the Church's contention that as a democratic, autonomous, separatist and congregational Baptist church, considering itself free from any "human authority, whether civil or ecclesiastical," it merits special concern of the First Amendment, even in the area of property rights. The contention is found invalid. We observe

that it was in relation to a Baptist church's property rights that the court in the previously cited case of *Providence Baptist Church* v. *Superior Ct.,* 40 Cal.2d 55, 60 [251 P.2d 10], stated: "As long as civil or property rights are involved, the courts will entertain jurisdiction of controversies in religious bodies although some ecclesiastical matters are incidentally involved."

The superior court's judgment was consistent with, and gave full effect to, the First Amendment.

■ Yet another contention of the Church is that the superior court misapplied the *cy pres* doctrine.

In the case of *In re Veterans' Industries, Inc., supra,* 8 Cal.App.3d 902, the court, as here, had occasion to apply that principle in dissolution of a nonprofit charitable corporation, in proceedings under Corporations Code section 9801. The court said: "By definition, in applying *cy pres* the court should order a distribution which will carry out the original trust purposes as nearly as possible. . . . It will not do to make a distribution to a charity whose purposes are generally similar if there is another charity whose purposes are identical, absent other factors which would frustrate the original charitable purpose. Basically, 'charitable contributions must be used only for the purposes for which they were received in trust' (*Holt* v. *College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2d 750, 754 [40 Cal.Rptr. 244, 394 P.2d 932]). 'The policy of the law in favor of charitable gifts requires a court to carry out the dominant purpose of the donor to make a charitable gift for the purposes expressed in the articles of the original corporate donee.' (*In re Los Angeles County Pioneer Soc.* (1953) *supra,* 40 Cal.2d 852, 865-866.) Only when compliance with these foregoing rules becomes impossible does the application of *cy pres* come into play." (8 Cal.App.3d, pp. 918-919; and see other authority there cited.) Those principles accurately state the law; they were binding upon the superior court and are now binding upon us.

The Church's articles of incorporation, as has now been repetitively stated, expressed the clear purpose of founding and conducting a Baptist church in Richmond, Contra Costa County. Under the *cy pres* doctrine its liquidated assets were properly divided between the two Baptist churches of similar fundamental persuasion nearest geographically to the City of Richmond. Distribution of any of those assets to the distant First Baptist Church of Harlan, Iowa, or to the nonsectarian and distant Beacon Inn Servicemen's Center of Long Beach, or to the nonchurch San Francisco Baptist Theological Seminary, would obviously have been

improper. There was no misapplication of the *cy pres* doctrine, as contended by the Church.

For these several reasons the judgment of the superior court must be affirmed.

A motion of the Attorney General to dismiss the Church's appeal is based upon controverted facts which, in the light of the conclusions we have reached, need not be resolved. The motion to dismiss the appeal will be denied.

The judgment is affirmed, and the motion to dismiss the appeal is denied.

Molinari, P. J., and Lazarus, J.,* concurred.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.