[No. B126930. Second Dist. Div. Four. Aug. 26, 1999.]

DONNA PINEDA ARMAN, Plaintiff and Appellant, v.
BANK OF AMERICA, N.T. & S.A., et al., Defendants and Respondents.

## COUNSEL

Roger J. Pryor for Plaintiff and Appellant.

Riordan & McKinzie, Jeffrey L. Glassman, Gina M. Calvelli and Reynolds T. Cafferata for Defendant and Respondent Bank of America, N.T. & S.A.

Bill Lockyer, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Carole R. Kornblum, Assistant Attorney General, and James M. Cordi, Deputy Attorney General, for Defendant and Respondent Attorney General of the State of California.

## OPINION

**CURRY, J.**—The trial court concluded that appellant Donna Pineda Arman, whose mother was named trustee in the will of John P. Lamerdin for a charitable trust to be created from funds remaining after the deaths of three members of Lamerdin's immediate family, lacked standing to petition the court for the appointment of a successor trustee after the death of her mother. The court went on to approve an established charitable organization as trustee in accordance with a proposal approved after mediation by respondents the Bank of America (the Bank) and the Attorney General. We affirm the trial court's orders.

### FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are not in dispute. After the death of Lamerdin, a 1970 court order for construction and final distribution of his will stated that the trust created by the will would be divided into two funds. Payments from these funds were to be made to Olga Lamerdin, Vera Hellawell, and Peter Lamerdin during their lifetimes.[1] The order went on to state that, "[u]pon the death of the survivor" of the three individuals, "the trust shall terminate and the corpus of the trust shall be distributed to Elvira J. Arman, as trustee, for the purpose of setting up a foundation to distribute and award scholarships for needy students."[2] The trustee was initially Security Pacific National Bank. In 1992, the Bank merged with Security Pacific, and succeeded it as trustee.

Vera Hellawell, the last of the three individual beneficiaries, died on September 27, 1996. By that time, Elvira Arman, too, was dead, having predeceased Vera by more than four years.

In October of 1997, appellant, the daughter of Elvira Arman, filed a petition to be named trustee of the trust which was to have been created by her mother. Appellant proposed using the remaining assets of the Lamerdin

---

[1] Olga was Lamerdin's wife, Vera was his sister, and Peter was his son.

[2] Elvira Arman, appellant's mother, was apparently the general manager of Lamerdin's Pontiac agency for some time prior to his death and a close friend of the Lamerdin family; she and her daughter often socialized with them.

estate to create a foundation—to be named the John P. Lamerdin Foundation—which would set up a scholarship program to benefit mentally and physically impaired children. Appellant stated that Lamerdin's son Peter had been mentally disabled and that Lamerdin often mentioned that he would like to help children with disabilities similar to Peter's obtain educational opportunities.

The Bank objected to the petition on numerous grounds, contending that appellant lacked standing to petition for appointment of a trustee in that she was not an heir, beneficiary or successor trustee; that appellant was not qualified to act as trustee of a charitable foundation; and that granting the petition would result in unnecessary taxes being imposed on the trust. In February of 1998, the Bank filed its own petition, stating that although Lamerdin had expressed a clear intent to create a charitable trust, his intent might ultimately be frustrated because the trust instrument lacked provision to obtain a determination of tax exempt status and lacked a structure to distribute the scholarships. The Bank proposed that the existing trust be modified to allow it to obtain a determination of tax exempt status and to allow distributions from the trust to be made to the California Community Foundation, which had experience administering scholarship programs. The Bank also sought to be appointed trustee of the new trust, and proposed charging an annual fee of one-half of 1 percent of the value of the fund's assets for rendering this service.[3]

Appellant supplemented her petition, offering the Fulfillment Fund as an existing charitable organization to administer the scholarships and proposing that Wells Fargo Bank manage the portfolio, which it had offered to do at a lesser charge. Appellant's attorney submitted a declaration in which he stated that, before he died, Lamerdin had expressed the view that he did not trust large impersonal institutions to carry out the purposes he had in mind. The Fulfillment Fund thereafter filed a separate statement of interest requesting that it be appointed trustee (which appellant opposed).

In the meantime, in March of 1998, the Attorney General stepped in by submitting a statement of interest, stating that since the public at large was the intended beneficiary of the trust proposed by Lamerdin's will, it was the proper party to represent the beneficiaries. (See Gov. Code, § 12586 et seq. [duties of Attorney General with respect to charitable trusts].) The Attorney General first took the position that as the only valid representative of the beneficiaries, it alone had the power to approve a trustee for the fund—and as between the Bank and appellant, it chose the Bank. The Attorney General also agreed with the Bank that the trust should be modified so as to qualify

---

[3]As we understand it, the assets of the trust have a value of approximately $2 million.

for tax exemption as a public charity rather than a private foundation, and—at least initially—agreed that the scholarship program be administered by the California Community Foundation. It did not object to including children with learning disabilities as beneficiaries of the funds. Later, the Attorney General asked the court to decide which of the potential trustees would be the best qualified between the Bank, the Fulfillment Fund, and the California Community Foundation.

In June of 1998, the trial court ordered the parties to seek mediation and asked for further briefing on the issue of standing. In August, the court issued a minute order dismissing appellant's petition on the ground that she lacked standing.[4] It further found that the Fulfillment Fund was without standing, but allowed it to file "Amicus Curie [*sic*] briefs as to appointment of successor trustee."

The parties—the Attorney General, the Bank, the Fulfillment Fund, and the California Community Foundation—participated in a mediation in September of 1998.[5] The participating parties agreed that the trust would be terminated and the assets distributed to the California Community Foundation to hold in a separate fund named the John P. Lamerdin Scholarship Fund which would continue to be managed by the Bank, along with the California Community Foundation's other assets. The California Community Foundation would distribute an amount equal to 4 percent of the value of the fund to scholarship recipients or other charities. In addition, an amount equal to 2 percent of the principal of the fund—less certain expenses—would be distributed to the Fulfillment Fund annually, which would award scholarships in Lamerdin's name. The agreement was presented to the court in the form of a petition for modification of the trust and appointment of a trustee. The court approved the petition by order dated November 3, 1998. Appellant appealed the order approving the petition for modification and the order dismissing her petition for lack of standing.

## DISCUSSION

 The standing dispute revolves around whether appellant is or is not an "interested person" under Probate Code section 48.[6] Subdivision (a) of that section defines "interested person" to "include[]": "(1) An heir, devisee, child, spouse, creditor, beneficiary, and any other person having a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding. [¶] (2) Any person having priority for

---

[4] A formal order was prepared and filed November 3, 1998.

[5] Counsel for appellant was present at the mediation, but the agreement was struck over his protests.

[6] All further statutory references are to the Probate Code unless otherwise indicated.

appointment as personal representative. [¶] (3) A fiduciary representing an interested person." Subdivision (b) adds: "The meaning of 'interested person' as it relates to particular persons may vary from time to time and shall be determined according to the particular purposes of, and matter involved in, any proceeding."

In *Estate of Davis* (1990) 219 Cal.App.3d 663 [268 Cal.Rptr. 384], where a probate administrator's surety was determined to be an interested person, the court stated: "Subdivision (a) of section 48 does not purport to provide an exclusive list of recognizable interests. Rather, it permits the court to designate as an interested person anyone having an interest in an estate which may be affected by a probate proceeding. Subdivision (b) allows the court to determine the sufficiency of that party's interest for the purposes of each proceeding conducted. Thus, a party may qualify as an interested person entitled to participate for purposes of one proceeding but not for another. [¶] Accordingly, section 48 gives the trial court more flexibility in controlling probate proceedings than does [the section of the Code of Civil Procedure governing intervention]." (219 Cal.App.3d at p. 668.)

In *Estate of Maniscalco* (1992) 9 Cal.App.4th 520, 522 [11 Cal.Rptr.2d 803], a prospective bidder on estate property who failed to attend a confirmation hearing, having no other preexisting relationship to the estate or to the property, was found by the trial court to be an interested party. In affirming the trial court's determination, the appellate court explained: "Section 48, subdivision (a) provides a nonexclusive list of recognizable interests, providing the court with the authority to designate as an 'interested person' anyone having a property right in or claim against an estate which may be affected by the probate proceeding. On the other hand, section 48, subdivision (b) broadly permits the court to determine the sufficiency of a party's interest for the purposes of each proceeding conducted. . . . Thus, section 48 is designed to provide the probate court with flexibility to control its proceedings to both further the best interests of the estate and to protect the rights of interested persons to those proceedings." (9 Cal.App.4th at pp. 523-524, fn. omitted.) Determination of whether a party has standing under section 48, subdivision (b), "requires [the trial court] to evaluate the underlying policy considerations regarding a specific probate proceeding in determining whether the person or party is sufficiently interested to intervene." (9 Cal.App.4th at p. 524.)

Here, the trial court ruled that appellant did not have standing under section 48. We review the trial court's determination under the "abuse of discretion" standard. (*Estate of Maniscalco, supra,* 9 Cal.App.4th at p. 525.)

As we can see from section 48 and the cases that have interpreted it, standing for purposes of the Probate Code is a fluid concept dependent on

the nature of the proceeding before the trial court and the parties' relationship to the proceeding, as well as to the trust (or estate). This means that before the issue of standing can be resolved, we must understand the nature of the proceedings so that we may determine the parties' relationship to it. As a practical matter, standing and the merits are closely tied, and it is often necessary to come to terms with the substantive claim before the issue of standing can be satisfactorily resolved.[7] Here, the issue is complicated by the fact that the parties do not agree on the type of proceeding that was presented to the trial court. Appellant contends the court should have proceeded under section 15410, governing disposition of property upon termination of a trust.[8] The Bank and the Attorney General take the position that the only thing before the court was a simple matter of filling a vacancy in the office of trustee governed by section 15660,[9] coupled with a motion to modify under section 15409.[10] ▬ ██ ██ In addition, while appellant contends that the doctrine of *cy près* should apply, both the Bank and the Attorney General argue that since Lamerdin's ultimate purpose of benefiting needy students is clear, the court need not resort to *cy près*.[11]

As expressed in the 1970 order, Lamerdin's intent was clear: after providing for the members of his immediate family during their lifetimes, the

---

[7]See, e.g., *Hart* v. *County of Los Angeles* (1968) 260 Cal.App.2d 512, 516 [67 Cal.Rptr. 242] (where plaintiff could not establish a reversionary interest in property donated to charity, his claim was subject to demurrer for lack of standing).

[8]Section 15410 provides in part: "At the termination of a trust, the trust property shall be disposed of as follows: [¶] . . . [¶] (c) . . . as provided in the trust instrument or in a manner directed by the court that conforms as nearly as possible to the intention of the settlor as expressed in the trust instrument."

[9]Section 15660 applies where "the trust has no trustee or if the trust instrument requires a vacancy in the office of a cotrustee to be filled. . . ." (§ 15660, subd. (a).)

[10]Section 15409 permits the court "[o]n petition by a trustee or beneficiary" to "modify the administrative or dispositive provisions of the trust or terminate the trust if, owing to circumstances not known to the settlor and not anticipated by the settlor, the continuation of the trust under its terms would defeat or substantially impair the accomplishment of the purposes of the trust." (§ 15409, subd. (a).)

[11]*Cy près* literally means "[a]s near as (possible)." (Black's Law Dict. (6th ed. 1990) p. 387, col. 2.) "The rule of *cy-pres* is a rule for the construction of instruments in equity, by which the intention of the party is carried out *as near as may be*, when it would be impossible or illegal to give it literal effect." (*Ibid.*, original italics.) It is frequently applied in situations where a charitable corporation to which a fund or property was donated has dissolved and is no longer in existence. (See, e.g., *In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850, 857-858 [121 Cal.Rptr. 899]; *Estate of Connolly* (1975) 48 Cal.App.3d 129, 131-133 [121 Cal.Rptr. 325]; *In re L. A. County Pioneer Society* (1953) 40 Cal.2d 852, 865-866 [257 P.2d 1]; see *Estate of Lamb* (1971) 19 Cal.App.3d 859, 867 [97 Cal.Rptr. 46] [organization had not yet been incorporated at the time of the testator's death].) "[U]nder the equitable doctrine of *cy pres* the corporate assets will ordinarily be transferred to another corporation, organization, society or trust so that the original trust purposes can be carried out, as nearly as possible. [Citation.]" (*In re Metropolitan Baptist Church of Richmond, Inc., supra*, 48 Cal.App.3d at pp. 857-858.)

remaining assets in his estate were to be transferred to his close friend and trusted employee Elvira Arman so that she could set up a trust to assist needy students with scholarships. In the expected course of events, when the last of the three individual beneficiaries died, the Bank's duties as trustee would have been concluded, and its only remaining responsibility would have been to transfer the funds in the account to Elvira Arman so that a trust could be set up under her direction. Unfortunately, Lamerdin's will did not anticipate the events which transpired—his sister lived to see her 94th birthday, whereas Elvira Arman died at the comparatively young age of 71. All the parties, including appellant, were in agreement that Lamerdin's intent was to provide scholarships to needy students whether or not Elvira Arman survived to set up and administer the charitable trust. The only problem was that the trustee he had personally selected was not available.

In this situation, the court's options are more limited than appellant supposes. The fact that Lamerdin was willing to entrust his assets to an individual inexperienced in administering charitable funds or creating tax exempt foundations does not mean that the court is free to do the same. There is no dispute that Lamerdin did not want a bank, a trust company, a charitable corporation, or other large impersonal organization to be the trustee—he wanted Elvira Arman. But acknowledging that still left the trial court with the question of what to do with funds left for a charitable purpose after the testator's specified trustee has died. The court's primary focus must be to ensure that funds intended for charitable purposes are in safe hands and properly administered. Rarely will this entail transferring funds to an individual, even one who is as close to the testator and his intended trustee as appellant. Appellant was not named by Lamerdin as a trustee, and she had no evidence to suggest that his will could be interpreted to insert her name as successor trustee in place of her mother's.

We believe the trial court made the proper determination here. Contrary to appellant's contention that the matter was resolved by an improper mediation, the evidence is clear that the mediation resulted in a *proposal* agreeable to the Attorney General, which was placed before the court for its approval. The proposal approved by the court placed the funds in the hands of an established organization which will hold them in Lamerdin's name. In addition, funds will be made available for distribution by the same organization recommended by appellant to administer her proposed trust.

For this reason, the trial court was correct in its determination that appellant lacked standing. Appellant had no more interest in the trust proceeds than anyone else acquainted with Lamerdin and familiar with his interests, and she presented no evidence which would have placed her in a

better posture. Her position was similar to that of the charitable organizations discussed in *In re Veterans' Industries, Inc.* (1970) 8 Cal.App.3d 902, 920 [88 Cal.Rptr. 303], which sought to object to the disposition of the assets of a dissolving nonprofit corporation that had similar charitable goals. The objecting organizations sincerely believed that the assets of the nonprofit corporation were being misdirected. The court in *Veterans' Industries* addressed the following questions: "What remedy, if any, is available to one who has good cause to believe that a proposed distribution [of a nonprofit corporation's assets] . . . will constitute a breach of trust, despite the Attorney General's consent to such distribution, but whose interest in the trust res rises no higher than that of a possible *cy pres* beneficiary? How is the public's paramount interest in the proper discharge of charitable trusts to be protected in such circumstances?" (8 Cal.App.3d at pp. 908-909, fn. omitted.) The court concluded that "[i]t is the Attorney General's duty to protect interests of the beneficiaries of a charitable trust"; that "a charitable corporation even if named as a possible successor trustee by the dissolving corporation does not have, as a possible beneficiary under application of *cy pres*, an 'interest different in kind from that of the public generally, which is represented exclusively by the Attorney General' "; and that "[t]he interest of a possible *cy pres* beneficiary not named or nominated by the dissolving corporation is of course no greater than that of one which is named or nominated. . . ." (*Id.* at pp. 919, 923, citations omitted.) The court affirmed the lower court's decision to strike the objections of the objecting organizations for lack of standing. The court went on to hold that if the party could not garner permission from the court to appear as amicus curiae or from the Attorney General to intervene as "a relator,"[12] the solution to the problem presented would be a petition for mandamus to require the Attorney General's office to perform its duty. (*Id.* at pp. 924-927.)

We are cognizant of the fact that at the time appellant filed her petition—more than a year after the death of Vera Hellawell—no action had been taken to see that the remaining funds were being utilized for the aid of needy students, and it appeared that no one was looking out for the interests of Lamerdin or the intended beneficiaries of the proposed trust. However, the answer was not for appellant to file a petition in her own name. The Attorney General is the only party with standing to represent the intended beneficiaries of a charitable trust. As the court held in *Veterans' Industries*, a party concerned that a breach of trust is taking place can only attempt to compel the Attorney General to perform his proper duty, he or she cannot intervene directly in an action on the trust.

---

[12]" 'A relator is a party in interest who is permitted to institute a proceeding in the name of the People or the attorney general when the right to sue resides solely in that official. . . .' " (*In re Veterans' Industries, Inc., supra*, 8 Cal.App.3d at p. 925, quoting *Brown* v. *Memorial Nat. Home Foundation* (1958) 162 Cal.App.2d 513, 538 [329 P.2d 118, 75 A.L.R.2d 427].)

## DISPOSITION

The orders of the trial court regarding standing and approving the petition for modification, both entered November 3, 1998, are affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied September 10, 1999, and appellant's petition for review by the Supreme Court was denied December 15, 1999. Baxter, J., and Chin, J., did not participate therein.